UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LANE NO. 1,

                              Plaintiff,

v.                                              5:06-CV-0508
                                                (GTS/GJD)
LANE MASTERS BOWLING INC.,

                              Defendant.
_____

APPEARANCES:                            OF COUNSEL:

BOND, SCHOENECK & KING, PLLC             DAVID L. NOCILLY, ESQ.
   Counsel for Plaintiff
One Lincoln Center
Syracuse, New York 13202-1355

LAW OFFICES OF EDWARD S. WRIGHT          EDWARD S. WRIGHT, ESQ.
   Counsel for Defendant
1100 Alma Street, Suite 207
Menlo Park, California 94025

HANCOCK & ESTABROOK, LLP                 ASHLEY D. HAYES, ESQ.
   Local Counsel for Defendant
1500 Tower I, P.O. Box 4976
Syracuse, New York 13221-4976

HON. GLENN T. SUDDABY, United States District Judge

**MEMORANDUM-DECISION and ORDER**

        This is a patent-infringement action filed by Lane No. 1 ("Plaintiff"), a manufacturer and

distributor of bowling products with its principal place of business in Syracuse, New York,

against Lane Masters Bowling Inc. ("Defendant"), a manufacturer, importer and distributor of

bowling products with its principal place of business in Stockton, California.  (Dkt. No. 1.)

Currently before the Court are Defendant's motion for partial summary judgment and Plaintiff's

cross-motion for partial summary judgment.  (Dkt. Nos. 24, 25.)  For the reasons set forth below, Defendant's motion is granted in part and denied in part, and Plaintiff's cross-motion is denied.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

On April 25, 2006, Plaintiff filed its Complaint in this action.  (Dkt. No. 1.)  Generally, in its Complaint, Plaintiff claims that Defendant has violated the patent laws of the United States, including 35 U.S.C. §§ 271 *et seq*., by making, importing, selling and/or offering to sell two series bowling balls whose designs–specifically, the designs of their "internal weight members"–are protected by a patent owned by Plaintiff and directed toward the enhancement of the angular momentum (or spin) of the bowling ball as it travels down a lane.  (*Id*. at ¶¶ 1, 7-11.) Familiarity with the factual allegations supporting this patent-infringement claim is assumed in this Decision and Order, which is intended primarily for review by the parties.  (*Id*.)

### B.    Defendant's Motion and Plaintiff's Cross-Motion

Generally, in support of its motion for partial summary judgment, Defendant argues as follows: (1) Plaintiff's patent is invalid for obviousness; (2) in any event, there is no infringement of Plaintiff's patent because Defendant's balls are not covered by Plaintiff's patent for three reasons (specifically, Defendant's balls have a taper that does not extend all the way to the ends of the weight block as it must, Defendant's balls have a taper that does not begin to move inward from an "intermediate axial position," which must occur at only one point (or line) of the weight block,[1] and/or Defendant's balls have an "internal cavity" in which is located a

---

[1]        During oral argument, Defendant's counsel disagreed with the Court's characterization of this issue as being whether the "intermediate axial position" must occur at only one "point" as opposed to any of several different "points."  (Oral Argument Tr. at 35.)  The

weight block with a density that is greater than that of the surrounding solid spherical body); and (3) Defendant is entitled to summary judgment on its counterclaim of tortious interference with business relations.  (*See generally* Dkt. No. 24, Attach. 26 [Def.'s Memo. of Law].)

In Plaintiff's response to Defendant's motion for partial summary judgment, and in further support of its own cross-motion for partial summary judgment, Plaintiff argues as follows: (1) Plaintiff's patent is valid; (2) it is not true that Plaintiff's patent covers only balls that have weight blocks whose tapers extend all the way to the ends of their weight blocks, nor is it true that Plaintiff's patent covers only balls that have weight blocks with a density that is the same as the density of the surrounding "solid, spherical body"; and (3) Defendant's counterclaim of tortious interference with business relations is barred as a matter of law.  (*See generally* Dkt. No. 25 [Plf.'s Response Memo. of Law].)

In its reply, in addition to reiterating previously advanced arguments, Defendant argues as follows: (1) Plaintiff's response fails to address the damaging admissions made by Plaintiff (in response to Defendant's request for admissions) on the issues of non-infringement and tortious interference with business relations, which compels the granting of Defendant's motion for partial summary judgment; and (2) Plaintiff's response does not address Defendant's argument that its balls do not infringe Plaintiff's patent because they have a taper that does not begin to

---

reason that Defendant's counsel disagreed with the Court's characterization is that "a point is a point.  A point doesn't go around the perimeter of a block."  (*Id*.)  Instead, Defendant's counsel argued that the location of the "intermediate axial position" should be characterized as the "radial plane."  (*Id*. at 35-36, 48.)  Because a plane is a flat surface (which would transect the weight member), it would not appear to be accurate to state that the taper in question begins at a plane; rather, the taper would appear to begin at the plane's *edge*, which would appear to be a line.  As a result, the Court will simply use the word "line" in describing the possible location of the "intermediate axial position."

move inward from an "intermediate axial position," which occurs at only one point (or line) of the weight block.  (*See generally* Dkt. No. 26 [Def.'s Reply Memo. of Law].)

### C.     Undisputed Material Facts

Generally, the undisputed material facts of this case are as follows.  (*Compare* Dkt. No. 24, Attach. 25 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 25, Attach. 1 [Plf.'s Rule 7.1 Response].)

Plaintiff is the owner of U.S. Patent Reg. 35,488 ("Plaintiff's patent"), issued April 1, 1997, on an application filed August 24, 1995.  Plaintiff's patent is a reissue of U.S. Patent Reg. 5,238,245, issued August 24, 1993, on an application filed August 3, 1992.

Plaintiff's patent regards a bowling ball containing essentially what is an elongated weight member that has an inward taper extending over at least a portion of its length from an intermediate axial position to each of a first end and a second end.  Plaintiff's patent states that a primary object of the invention is to provide a bowling ball containing a weighted member that will optimize the ball's angular momentum for any given delivery.

The scope and content of the "prior art"[2] on the subject encompasses bowling balls and the weight blocks or cores employed in them to control the dynamics of the balls as they roll down a lane, and includes U.S. Patent Reg. 5,215,304, issued June 1, 1993, on an application

---

[2]     *See Papyrus Tech. Corp. v. New York Stock Exch., LLC*, 653 F. Supp.2d 402, 416-17, 419 (S.D.N.Y. 2009) ("The scope and content of prior art includes that art which is reasonably pertinent to the particular problem with which the inventor was involved. . . . Crucially, prior art encompasses not only the field of the inventor's endeavor but also any analogous arts. . . .  To ascertain the scope of the prior art, a court examines the field of the inventor's endeavor, and the particular problem with which the inventor was involved, at the time the invention was made. . . .  Prior art includes any patents published or issued before the date of the claimed invention and any United States patent application filed before the date of invention and subsequently issued.") (internal quotation marks and citations omitted).

filed April 24, 1991 (the "Pinel Patent"),[3] and British Patent GB 27,680 issued in 1912 (the "British Patent").[4]

### 1.      Plaintiff's Patent

Plaintiff's patent consists of nine (9) claims.  Claim 1 of Plaintiff's patent is directed to a bowling ball, which is to what the Pinel Patent and the British Patent are both directed.  More specifically, Claim 1 of Plaintiff's patent claims that the bowling ball consists essentially of (1) a solid body having a substantially spherical outer surface and a first homogenous density, (2) one or more concentric layers in the solid body, the inner most layer being a solid sphere and any other layers being of substantially constant thickness, surrounding and contacting the next inner layer, each of said layers being of predetermined homogenous density, and (3) a single, elongated weight member integrally positioned within and entirely surrounded by the body, which is substantially symmetrical about a central, linear axis, and which has (a) first and second terminal ends, (b) a maximum cross-section at an intermediate axial position between the first and second ends, (c) a second homogeneous density substantially greater than the first homogeneous density and the predetermined homogeneous density, (d) an inward taper extending over at least a portion of its length from the intermediate axial position to each of the first and second ends,[5] and (e) a non-circular cross-section in all planes parallel to the linear axis.

---

[3]      The application on which the Pinel Patent issued was filed before the inventor made the invention claimed in Plaintiff's patent, and the Pinel Patent is therefore prior art under 35 U.S.C. § 102(e).

[4]      The British Patent, which was published long before the inventor made the invention claimed in Plaintiff's patent and more than a year before original application leading to the patent was filed, constitutes prior art under 35 U.S.C. §§ 102(a) and 102(b).

[5]      As originally filed, the claims of Application No. 923,606 (Plaintiff's initial patent application) did not require the taper to extend to the ends of the weight block.  As

Claim 2 of Plaintiff's patent claims that the invention according to Claim 1 (i.e., the bowling ball with the characteristics identified in Claim 1) has a center of gravity offset from the geometric center of the ball.

Claim 3 of Plaintiff's patent claims that the invention according to Claim 1 has a center of gravity coincident with the geometric center of the ball.

Claim 4 of Plaintiff's patent claims that the first and second ends of the weight block according to Claim 1 are equidistant from the intermediate axial position.

Claim 5, which was also intended to depend from Claim 1, claims that one of the first and second terminal ends is positioned closer to the intermediate axial position than the other.

Claim 6 "depends from"[6] Claim 1 and claims that the weight member is of polygonal cross-section in all planes transverse to the linear axis.

Claim 7 depends from Claim 1 and claims that the weight member tapers uniformly from the intermediate axial position to each of the first and second ends.

_____

originally filed, Claim 1 of Application No. 923,606 called for "a weight member substantially symmetrical about a central, linear axis, said member having a maximum cross-section at an intermediate axial position and tapering inwardly over at least a portion of its length from said position toward each of two, opposite, terminal ends. . . ."  A second independent claim in Application No. 923,606, as originally filed, defined the weight member as "tapering inwardly in both directions from said intermediate position with respect to said axis over at least a portion of its length toward two, opposite, terminal ends. . . ."

[6]        When used in the context of patent law, the term "depends from" essentially describes a relationship between two claims–a "dependent claim" and a "parent claim" (which itself may be either a "dependent claim" or an "independent claim")–in which the dependent claim refers to, incorporates all the limitations of, and further limits, the parent claim.  (In other words, the dependent claim *depends from,* or hangs down from, the parent claim.)  *See* David A. Burge, *Patent and Trademark: Tactics and Practice* 57 (3d ed. 1999 John Wiley & Sons, Inc.).

Claim 8 depends from Claim 1 and claims that the body of the ball includes at least one blind grip hole extending from the outer surface into the body.

Claim 9 depends from Claim 1 and claims that the weight member's density is homogenous throughout.

2.      **The Pinel Patent**

The bowling ball shown in the Pinel Patent has a spherical body and an elongated weight member that consists of a cylindrical body portion, a spherically curved head portion, and a tapered lower tip portion, with the weight member being symmetrical about its longitudinal axis and of greater density than the body.  The body of the ball shown in the Pinel Patent is formed as a unitary mass of a compound such as polyester or urethane compounded to an appropriate density, and the weight member is of constant density.  The Pinel Patent depicts a weight member embedded directly in the body of a ball in the same manner that a weight member is embedded in the body of the ball shown in Plaintiff's patent.

The weight member shown in Figure 1 of the Pinel Patent is a single, elongated weight member, which is embedded in the body of the ball.  The head portion of the weight block shown in the Pinel Patent has a convex spherical curvature that extends from body portion to the upper end of the block.

The only differences between the claimed bowling ball (i.e., Plaintiff's patented ball) and the bowling ball shown in the Pinel Patent are the following: (1) the weight member in the claimed bowling ball does not have an extended cylindrical body portion like the weight member shown in the Pinel Patent; and (2) the weight member in the claimed bowling ball has conical tapers at both ends while the weight member shown in the Pinel Patent has a conical taper at one end and a convex spherical curvature at the other.

7

### 3.      The British Patent

The bowling ball shown in the British Patent has a spherical body made of wood and a pair of conically tapered lead weights with their large ends positioned back-to-back within the body, which form an overall shape almost identical to the weight block shown in Plaintiff's patent.  To prevent the weights from shifting when the wood shrinks, the weights in the ball shown in the British Patent are mounted in rubber pockets in a bore, with tapered spacers at the outer ends of the weights and a screw plug for compressing the rubber against the weights so that it can expand and keep the weights in the proper position if the wood shrinks.

The only differences between the claimed bowling ball and the bowling ball shown in the British Patent are the following: (1) the weight member in the claimed bowling ball is formed as a single piece, while the weight block in the British Patent is formed in two pieces; and (2) the weight member in the claimed bowling ball is integrally positioned within the body of the claimed ball (i.e., embedded directly in the body), rather than being encased in compressed rubber within the body.

### 4.      Defendant's Balls

As stated above in Part I.A. of this Decision and Order, Plaintiff claims that two series of Defendant's balls–the Satisfaxion balls and the World Class balls–infringe on Plaintiff's patent.[7] The weight block or core in the Satisfaxion balls has untapered masses, or flip blocks, between

---

[7]      Since filing the Complaint, Plaintiff has also told sellers of Defendant's balls that resale of a third ball called the Buzz ball would be an infringement.  However, the Buzz ball is not referenced in the Complaint.  (*See generally* Dkt. No. 1.)  Moreover, in its response to Defendant's Statement of Material Fact Nos. 89 and 103, Plaintiff admits that the Buzz ball is not at issue in either the infringement claim or Defendant's motion for summary judgment.  (Dkt. No. 25, Part 1, ¶¶ 89, 103.)  Finally, during oral argument, Plaintiff's counsel indicated that, at the time it drafted its Complaint, it did not have available to it sufficient information to assert infringement claims regarding Defendant's Buzz ball.  (Oral Argument Tr. at 9-11.)  As a result, the Court does not discuss the Buzz ball in this Decision and Order.

the tapered portions and the ends of the blocks.  The flip blocks on the core in the Satisfaxion

balls are important in providing large differential and radius of gyration, which improve the hook

of the balls.

    With regard to the World Class balls, two different weight blocks or cores have been

used in these balls.  The original core for the World Class balls also has relatively large,

untapered masses, or flip blocks, between the tapered portions and the ends of the blocks.  The

flip blocks in the original World Class core are important in providing large differential and

radius of gyration, which improves the hook of the ball.  The tapers of the original World Class

core extend only to the flip blocks, not to the ends of the weight member or core.

    The new weight block or core used in the World Class balls has relatively large,

untapered flip blocks near its ends and a relatively large untapered stabilizing block toward the

middle.  Between the upper flip block and the upper end of the stabilizing block, the new weight

block or core in the World Class balls has a convex or spherical curvature and, between the

lower end of the stabilizing block and the lower flip block, it has a concave curvature.  The new

weight block or core for the World Class balls does not have a taper that extends from an

intermediate axial position to the terminal ends of the weight member.

    Defendant sells its bowling balls through an established network of distributors who, in

turn, sell them to pro shops and online distributors who sell them to bowlers.  Shortly after the

Complaint was filed in this action, Plaintiff began contacting the distributors, pro shops, and

online distributors who sold Defendant's bowling balls, telling them that it had sued Defendant

for patent infringement, that they were also infringing the patent by selling the Satisfaxion,

World Class, and Buzz balls, and that they would be joined in the suit with Defendant and have

to pay damages if they did not stop selling those balls.  The threats were made by email,

telephone and letter.[8]

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties.  (*Id*.)

## II.     RELEVANT LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that  well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B.     Legal Standards Governing Plaintiff's Claims and Defendant's Counterclaims

#### 1.     Plaintiff's Claim of Patent Infringement

##### a.     Overcoming Presumption of Patent Validity

"For an invention to be patentable, it must meet three requirements: utility, novelty, and nonobviousness."  *Papyrus Tech. Corp. v. New York Stock Exch., LLC*, 653 F. Supp.2d 402, 414 (S.D.N.Y. 2009) (citing 35 U.S.C. §§ 101-103; *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech*., 543 F.3d 657, 661 [Fed. Cir. 2008] ).  "Once a patent issues, it is thereafter presumed valid."  *Papyrus Tech. Corp.*, 653 F. Supp.2d at 414 (citing 35 U.S.C. § 282).  "To

---

[8]     Plaintiff has admitted contacting the distributors and pro shops and making the threats.

overcome this presumption of validity, 'the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence.'" *Id*. (quoting *Schumer v. Lab. Computer Sys., Inc*., 308 F.3d 1304, 1315 [Fed. Cir. 2002]). "For evidence to be clear and convincing, it must give the finder of fact 'an abiding conviction that the truth of the proponent's factual contentions is highly probable.'" *Id*. (quoting *In re Omeprazole Patent Lit*., 490 F. Supp.2d 381, 500 [S.D.N.Y. 2007]) (other citation omitted).

"A patent claim may be held invalid if it is anticipated or made obvious by prior art." *Id*.[9] "A patent may be invalid due to obviousness if 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *Id*. (citing 35 U.S.C. § 103[a]). "Whether a patent is obvious 'is a question of law premised on underlying findings of fact.'" *Id*. (quoting *Eolas Techs. Inc. v. Microsoft Corp*., 399 F.3d 1325, 1332 [Fed. Cir. 2005]). "Under § 103, the court considers factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the claims, and (3) the level of ordinary skill in the pertinent art." *Id*. "The court may also consider secondary considerations such as commercial success, long felt but unsolved needs, and the failure of others, so as 'to give light to the circumstances surrounding the origin of the subject matter sought to be patented.'" *Id*. "Crucially, the relevant question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art." *Id*. (internal quotation marks omitted).

"A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id*. "However, the mere

---

[9]     There is no claim of anticipation at issue here.

combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id*. at 414-15. "It is widely understood that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one." *Id*. at 415 (internal quotation marks omitted). "Where a person of ordinary skill can implement a predictable variation of a technique available in the same field of endeavor or a different one, § 103 will likely bar patentability of the variation." *Id*. "However, in cases where the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id*.

"To determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue, it may be necessary for a court to examine the interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art. . . ." *Id*. (internal quotation marks omitted). "In so doing, a factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." *Id*. (internal quotation marks omitted).

"The Federal Circuit's teaching, suggestion, and motivation ('TSM') test prevents hindsight and focuses on evidence before the time of invention. . . ." *Id*. (internal quotation marks omitted). "The TSM test, flexibly applied, [ ]assures that the obviousness test proceeds on the basis of evidence–teachings, suggestions (a tellingly broad term), or motivations (an equally broad term)–that arise before the time of invention as the statute requires." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc*., 520 F.3d 1358, 1365 (Fed. Cir. 2008). "The court need not seek out precise teachings directed to the specific subject matter of the challenged claim, but

rather, can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Papyrus Tech. Corp.*, 653 F. Supp.2d at 415 (internal quotation marks omitted).

### b.   Determining Infringement of Patent

When resolving patent infringement claims, a court must undergo a two-step analysis. "The first step is determining the meaning and scope of the patent claims asserted to be infringed. . . .   The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  "The first question presents a legal question to be resolved by the courts, while the second question is generally reserved for the fact finder."  *Pall Corp. v. Cuno Inc.*, 03-CV-0092, 2007 WL 2363019, at *3 (E.D.N.Y. Aug. 14, 2007) (citing *Markman*, 52 F.2d at 981 [noting, however, that the court may use its construction of the claim in framing its jury charge as well as in deciding dispositive motions]).

"In construing claims, the claim terms should be given their 'ordinary and customary meaning.'"  *Elbex Video, Ltd. v. Axis Commc'ns, Inc.*, 05-CV-3345, 2008 WL 5779782, at *2 (E.D.N.Y. Aug. 19, 2008) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 [Fed. Cir. 1996]).  In other words, "[the] meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

"In determining how a person of 'ordinary skill in the art' would understand and define the terms in a claim, the court has a number of sources available to it."  *Elbex Video, Ltd.*, 2008 WL 5779782, at *2 (E.D.N.Y. Aug. 19, 2008).  "Of primary importance is not only the 'context of the particular claim in which the disputed term appears, but . . . the context of the entire

patent, including the specification.'"  *Id*. (quoting *Phillips*, 415 F.3d at 1313).  "Indeed, the context of the claim itself is 'highly instructive' in a determination of the meaning of a term, and furthermore, 'the usage of a term in one claim can often illuminate the meaning of the same term in other claims.'"  *Id*. (quoting *Phillips*, 415 F.3d at 1314).

The language of the patent itself and its accompanying claims, the specifications accompanying the claims, as well as the prosecution history before the PTO, is the intrinsic evidence that a court must first consider when construing claims.  *See Pall Corp.*, 2007 WL 2363019, at *3.  "Together, these sources are 'the most significant source of the legally operative meaning of disputed claim language.'"  *Id*. (quoting *Vitrionics Corp.*, 90 F.3d at 1582).

In the *Phillips* decision, the Federal Circuit made clear that, only after examining the intrinsic evidence may a court turn to sources outside the patent itself.  *Phillips*, 415 F.3d at 1317.  "These other sources, referred to as 'extrinsic' evidence, include testimony by the inventor or experts in the field, dictionaries, and treatises."  *Elbex Video, Ltd.*, 2008 WL 5779782, at *3 (citing *Phillips*, 415 F.3d at 1317).  "Dictionaries and treatises may be helpful to the court's understanding of the patent's 'underlying technology' and to demonstrate how one skilled in the relevant art would understand the disputed terms."  *Id*. (quoting *Phillips*, 415 F.3d at 1318).  "Expert testimony may be useful . . . to provide background on the technology at issue, . . . explain how an invention works, . . . ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or . . . establish [terms and meanings] in the patent or . . . prior art."  *Id*. (quoting *Phillips*, 415 F.3d at 1318).

### 2.    Defendant's Claim of Tortious Interference with Business Relations

"[F]ederal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential

litigation." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004); *see also Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002) ("[F]ederal patent law bars the imposition of liability [under federal or state law] for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith.") (internal quotation marks omitted; alteration in original).  Moreover, "[t]he law recognizes a presumption that the assertion of a duly granted patent is made in good faith; this presumption is overcome only by affirmative evidence of bad faith."  *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999).

As a result, when a defendant asserts a counterclaim under state tort law based on assertions a plaintiff's claim of patent infringement, "even if it is not generally a required element of the state cause of action, there can be no liability unless [the defendant] clears the additional hurdle of proving bad faith."  *Plasmart, Inc. v. Wincell Int'l Inc.*, 442 F. Supp.2d 53, 57 (S.D.N.Y. 2006).  In other words, "[e]ven if a [plaintiff's] contention that its patents are being infringed eventually proves inaccurate, statements asserting infringement are protected unless a [defendant] can provide 'clear and convincing evidence that the infringement allegations are objectively false, and that the patentee made them in bad faith, *viz.*, with knowledge of their incorrectness or falsity, or disregard for either. . . .'"  *Plasmart, Inc.*, 442 F. Supp.2d at 57 (quoting *Golan*, 310 F.3d at 1371).  Moreover, "[t]he burden rests with the [defendant] to prove bad faith."  *Id*.

Furthermore, "[t]he Federal Circuit has made clear that, even if [a defendant] can demonstrate subjective bad faith, liability cannot be imposed unless the assertions of patent infringement are not merely incorrect, but 'objectively baseless.'"  *Id*. (citing *Globetrotter*, 362 F.3d at 1375-77).  "In applying the 'objectively baseless' standard to the assessment of state law

tort claims premised on patent infringement contentions, the Federal Circuit expressly adopted

the definition of 'objectively baseless' set forth by the Supreme Court in *Prof'l Real Estate*

*Investors, Inc. v. Columbia Pictures Indus.*, *Inc*., 508 U.S. 49 (1993). *Id.* "That is, the threat of

an infringement suit 'must be objectively baseless in the sense that no reasonable litigant could

realistically expect success on the merits.'" *Id.* (quoting, *inter alia*, *Globetrotter*, 362 F.3d at

1376).

### III.   ANALYSIS

#### A.   Plaintiff's Claim of Patent Infringement

As stated above in Part I.B. of this Decision and Order, in support of its motion for partial

summary judgment, Defendant argues as follows: (1) Plaintiff's patent is invalid for obviousness;

(2) in any event, there is no infringement of Plaintiff's patent because Defendant's balls are not

covered by Plaintiff's patent.

##### 1.   Whether Plaintiff's Patent Is Invalid for Obviousness

In response to Defendant's argument that Plaintiff's patent is invalid for obviousness,

Plaintiff argues that "Defendant's proposed combination of the Pinel Patent and the British

Patent fail[s] to disclose the claimed single elongated weight member that is completely

surrounded by the solid body and which includes a taper extending from the position of the

weight block's maximum cross-section at least a portion of the way to either end." (Dkt. No.

25.)  According to Plaintiff, "Defendant admits that the Pinel Patent lacks the taper that extends

from a single position of a maximum cross-section, and Defendant also admits that the British

Patent does not have a single elongated weight member that is completely surrounded by the

body." (*Id.*)  "Thus, the combination of the Pinel and British Patents admittedly fails to disclose

all of the elements of the claimed invention as required for a claim of invalidity . . . ." (*Id.*)

16

In reply, Defendant argues that Plaintiff's patent is obvious for the following reasons: (1) "the features which Plaintiff says are lacking in one reference are found in the other"; (2) the claimed invention is no more than a substitution of the weight block shown in the British patent for the one shown in the Pinel Patent; and (3) "there is no suggestion that the substitution of one known weight block for another yielded any new or unexpected result or did anything other than what one would expect."  (Dkt. No. 26.)

Based on the current record, the Court rejects Defendant's arguments.  As an initial matter, because Plaintiff has a federally registered patent, Defendant bears the burden of demonstrating invalidity of that patent by clear and convincing evidence.  Therefore, it is not enough for Defendant to simply *argue* that Plaintiff's patent is invalid because "[t]here is no suggestion in Plaintiff's Patent that embedding the weight block directly in the body produced any new or unexpected result or made the weight block function any differently."  Rather, Defendant must *prove*, by clear and convincing evidence, that embedding the claimed weight block directly in the claimed body, did not produce any new or unexpected result or make the weight block function differently.

Defendant has not so proved this fact.  For example, the Court notes that Defendant has not introduced any evidence to suggest that, based on the level of ordinary skill in the field of bowling ball weight block design and construction, the weight block in the Pinel Patent and the weight pieces in the British Patent are substantially identical in shape and function to the claimed weight block.  Indeed, Defendant has introduced evidence that the design of bowling balls with weight blocks having the proper size, shape and mass to impart the desired dynamic characteristics to the balls as they travel down a lane is a relatively sophisticated art.

17

In addition, although the Pinel Patent and the British Patent constitute prior art,[10] there are noticeable differences between the claims in Plaintiff's patent and the prior art. For example, the Pinel Patent does not have a taper that begins to extend inward from a maximum cross-section that occurs in only one point (or line) of the weight block. Furthermore, although the British Patent does have a such an inward taper, the weight pieces in the British Patent are different from the weight block in Plaintiff's patent. More specifically, the British Patent has two weight pieces (as opposed to a single weight block), which are clamped together by a screw plug, encased in rubber, and not completely surrounded by the body (unlike the claimed weight block).

In sum, after carefully considering the admissible record evidence, the Court concludes that Defendant has failed to demonstrate invalidity by clear and convincing evidence because, *inter alia*, (1) there are noticeable differences between the claims in Plaintiff's patent and the prior art, (2) the design and construction of weight blocks is a sophisticated art, and (3) there is no evidence demonstrating the similarity in function between Plaintiff's patent and the prior art. For all these reasons, the Court rejects Defendant's argument that Plaintiff's patent is invalid for obviousness.

### 2. Whether Defendant's Balls Infringe on Plaintiff's Patent

As stated above in Part I.B. of this Decision and Order, Defendant argues that there has been no infringement of Plaintiff's patent because Defendant's balls are not covered by that patent for three reasons: (1) Defendant's balls have a taper that does not extend all the way to the ends of their weight block, as it must; (2) Defendant's balls have a taper that does not begin to move inward from an "intermediate axial position," which must occur at only one point (or line)

---

[10]    *See, supra*, Part I.B. of this Decision and Order.

of the weight block; and (3) Defendant's balls have an "internal cavity" in which is located a weight block with a density that is greater than that of surrounding solid spherical body.

An evaluation of the first two arguments turns on (1) a determination of the meaning and scope of the clause "weight member . . . having . . . an inward taper extending over at least a portion of its length from said intermediate axial position to each of said first and second ends," and (2) a comparison of the properly construed claims and Defendant's bowling balls.  Similarly, an evaluation of the third argument turns on (1) a determination of the meaning and scope of the phrase "solid body having . . . a homogeneous density," and (2) a comparison of the properly construed claims and Defendant's bowling balls.

> a.    **Meaning and Scope of Clause "Weight Member . . . Having . . . an Inward Taper Extending over at Least a Portion of Its Length from said Intermediate Axial Position to Each of said First and Second Ends"**

Before the Court evaluates the two main arguments made by Defendant regarding the meaning and scope of the clause in question (i.e., regarding the starting point and ending point of the tapers contained in the weight blocks), the Court pauses to address a subordinate argument used to support both of those main arguments–specifically, Defendant's reoccurring argument that, by failing to respond to its requests for admission regarding the taper, Plaintiff has made damaging, and indeed fatal, admissions regarding that taper.  Before a failure to respond to a request for admission may be deemed to be an admission, the propounding party must prove (1) the propriety of the request, (2) the proper service of the request, and (3) a failure to respond to the request.  *See* 8B Wright & Miller, *Federal Practice and Procedure*, § 2264, at 374 (West 2010).

Here, Defendant has proved the third fact.  (*Compare* Dkt. No. 24, Part 25, ¶ 12 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 25, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response].)  In addition,

Defendant has proved the second fact.  More specifically, while Plaintiff has denied receiving

the requests for admission by mail (and admits to receiving them only by email), Plaintiff fails to

support that denial with a citation to admissible record evidence, as required by Local Rule

7.1(a)(3).  (*Compare* Dkt. No. 24, Part 25, ¶ 11 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 25,

Part 1, ¶ 11 [Plf.'s Rule 7.1 Response].)[11]  Moreover, Defendant has adduced a certificate of

service stating that Defendant did serve the requests for admission by mail.  (Dkt. No. 24, Part

11; *see also* Dkt. No. 24, Part 1, ¶¶ 11-12.)

However, Defendant has failed to prove the first fact, i.e., that its seven key requests for

admission on the taper issue (Request for Admission Nos. 49, 50, 52, 54, 55, 57 and 58) were

proper.  Rather, it appears to the Court that each of those seven requests calls for the making of

legal conclusions and/or the determination of ultimate issues by either (1) asking whether a

patent is valid (as does Request for Admission No. 49), or (2) asking whether infringement has

occurred (as do Request for Admission Nos. 50, 52, 54, 55, 57, 58).  *See Tulip Computers Int'l,*

*B.V. v. Dell Computer Corp.,* 210 F.R.D. 100, 108 (D. Del. 2002) ("[R]equests that seek legal

conclusions are not allowed under Rule 36. . . .  As a result, determining whether a patent is valid

would call for a legal conclusion although dependent on factual inquiries. . . .  Similarly,

determining whether a product or process infringes or whether infringement has occurred

involves the requirement of claim construction, which is a legal determination within the

province of the court.") (citations omitted); *Golden Valley Microwave Foods, Inc. v. Weaver*

---

[11]     The Court notes that, had Plaintiff served its requests for admission only by email, the Court's finding on this issue might be different.  *See* Fed. R. Civ. P. 5(b)(E) (stating that service by electronic means is valid only if the person consents in writing); N.D.N.Y. Gen. Order # 22, ¶ 5.2 (authorizing electronic service in certain circumstances, but limiting those circumstances to instances in which papers that are *filed* with the Court's Electronic Case Files System).

*Popcorn Co., Inc.,* 130 F.R.D. 92, 96 (N.D. Ind. 1990) ("[W]hether a patent is valid calls for a

legal conclusion although its answer may depend upon factual inquiries. . . .  Correspondingly,

claim validity, like patent validity, is also a legal conclusion subject to the many facts which

seemingly swirl about such issues. . . . [R]equests seeking a bald legal conclusion that certain

patent claims are invalid run[] counter to the proscription of FRCP Rule 36(a).") (citations

omitted).[12]  For this reason, the Court rejects Defendant's argument that, by failing to respond to

its requests for admission regarding the taper, Plaintiff has made damaging, and indeed fatal,

admissions regarding that taper.

Proceeding to an evaluation of the two main arguments made by Defendant regarding the

meaning and scope of the clause in question, the Court construes these arguments, and Plaintiff's

response to them, as raising the following two issues: (1) whether the weight block's inward

taper must extend all the way to the block's terminal ends or only a portion of the way to those

terminal ends; and (2) whether the weight block's "intermediate axial position" must occur at

only one point (or line) or whether it may exist at any of several points (or lines), as depicted in

Figures 1 and 2 in the Pinel Patent.

With regard to the first issue, Plaintiff's patent describes a "weight member . . . having

_____

[12]      *Accord*, *Streck, Inc. v. Research & Diagnostic Sys., Inc.,* 06-CV-0458, 2009 WL
1616629, at *2 (D. Neb. June 4, 2009) (finding requests for admission that "require the
defendants to assume that [the plaintiff's] patents and claims are valid and enforceable" to be
improper under Fed. R. Civ. P. 36); *Fulhorst v. United Tech. Auto., Inc.,* 96-CV-0577, 1997 WL
873548, at *3 (D. Del. Nov. 17, 1997) ("In Request No. 19, Defendant asks Plaintiff to assume
that the allegedly infringing device is used in a certain manner, and then asks Plaintiff to admit
that the device, if used in such a manner, infringes on Plaintiff's patent. Determining whether
infringement has occurred involves, in the first instance, claim construction, which is a legal
conclusion drawn by a court."); *Naxon Telesign Corp. v. GTE Info. Sys., Inc.*, 30 Fed. R. Serv.2d
1286, 1287 (N.D. Ill. 1980) ("[E]ach of [the Requests] quotes selected language from the Naxon
patent and asks that it be admitted that various elements disclosed in Unkles satisfy that quoted
language. In combination those Requests seek to obtain an admission of the ultimate legal
conclusion in the case rather than admissions 'of fact or of the application of law to fact.'").

. . . an inward taper extending over at least a portion of its length from said intermediate axial position to each of said first and second ends."[13]  During oral argument, counsel characterized the parties' dispute over where the taper must end as arising from the meaning of the words "its length" in the above-described clause.  Specifically, Plaintiff's counsel construed the words "its length" as referring to the "weight block's length."  (Oral Argument Tr. at 4-5, 16-17, 43.)  Conversely, Defendant's counsel construed the words "its length" as referring to the "taper's length."  (Oral Argument Tr. at 26-29, 47-48.)  With all due respect to counsel, the Court finds two problems with this characterization of the dispute in question.

First, under the circumstances, it appears grammatically unreasonable (if not impossible) to construe the words "its length" as referring to anything other than the "weight member's length."  As an initial matter, because of the prominent role that the noun "weight member" plays in the first half of the clause (appearing twice), the possessive pronoun "its" rather clearly refers to the "weight member's."  Furthermore, the only other possessive noun to which the possessive pronoun "its" could grammatically refer, given the construction of the clause, is the "taper's."  However, such a construction appears nonsensical because it would cause the clause

---

[13]        Specifically, Plaintiff's patent states as follows: "[w]hat is claimed is . . . [a] bowling ball consisting essentially of . . . a single, elongated weight member . . . , said weight member . . . having . . . a maximum cross-section at an intermediate axial position . . . . [and] an inward taper extending over at least a portion of its length from said intermediate axial position to each of said first and second ends . . . ."  (Dkt. No. 24, Attach. 2, at 7 [Ex. EW-1 to Wright Decl., attaching Plf.'s Patent]; see also Dkt. No. 24, Attach. 2, at 7 ["[S]aid weight member tapers uniformly from said intermediate axial position to each of said first and second ends."]; Dkt. No. 24, Attach. 2, at 1 ["The weight member has a longitudinal axis with a maximum cross-section at an intermediate axial position, and an inward uniform taper extending from this intermediate axial position towards opposite, terminal ends."]; Dkt. No. 24, Attach. 2, at 6 ["The weight block is, in general, a longitudinal object having a maximum cross-section at an intermediate axial position, and an inward taper going from this intermediate axial position to opposite, terminal ends. . . .  Weight member has a maximum cross-section at an intermediate axial position and uniformly tapers inwards from said intermediate axial position to opposite ends."].)

in question to read as follows: a "weight block . . . with . . . an inward taper extending over at least a portion of [the taper's] length from said intermediate axial position to each of said first and second ends."  During oral argument, Defendant's counsel failed to explain, and the Court is unable to imagine, how a taper could possibly extend over only a portion of its own length.[14]

Second, in any event, the Court is unable to see how the parties' dispute over the meaning of the words "its length" explains their dispute over where the taper must end.  Just because the words "its length" mean the "weight member's length" does not necessarily mean that Plaintiff's patent covers tapers that do not extend all the way to the ends of the weight member.  Plaintiff still has to reckon with the role of the phrase "from said intermediate axial position *to* each of said first and second ends," in the clause in question.  (Dkt. No. 24, Attach. 2, at 7 [Ex. EW-1 to Wright Decl., attaching Plf.'s Patent] [emphasis added].)  This is why, during oral argument, when he was not taking issue with the Court's characterization of the dispute in question, Defendant's counsel focused on that particular phrase.  (Oral Argument Tr. at 7-8 ["Now what that language says is [that] one portion of the taper extends from the intermediate axial position [to] one end, [and] the other portion extends from that intermediate axial [position] to the other end. . . .  The patent doesn't . . . describe a taper that only goes partway."]; Oral Argument Tr. at 47-48 ["[The language] means that [the taper] extends over one part of its length from the midpoint let's say to the end, and over a second part of its length from the midpoint to the other end . . . ."].)

_____

[14]      The closest Defendant's counsel came to offering this explanation during oral argument is when he illogically suggested that the words "its length" simultaneously means (1) the joint length of both tapers and (2) the individual length of each taper.  (Oral Argument Tr. at 47-48 ["When I first saw the language in claim 1 about a taper extending over its own length, I would have to agree with [Plaintiff's counsel], it made no sense, but then when I started studying the language a little bit, [I] realized that it means that [the taper] extends over one part of its length from the midpoint let's say to the end, and over a second part of its length from the midpoint to the other end . . . ."].)

Rather than turning on the meaning of the possessive pronoun "its length," the Court understands the parties' dispute over where the taper must end as more precisely turning on whether the prepositional phrase "from said intermediate axial position to each of said first and second ends" is restrictive in nature (such that the words "from . . . to . . ." designate the precise *part* of the weight block's length over which a *portion* of the taper must travel) or non-restrictive in nature (such that the words "from . . . to . . ." merely elaborate on the portion of the weight block's entire length over which the taper must travel).  Simply stated, the parties' dispute appears, from the Court's perspective, to turn on the parties' interpretations–whether conscious or not–of the language "a portion of [the weight block's] length from . . . ."

As explained in the Court's questions to counsel, in construing this phrase as requiring that the taper extend all the way to the weight block's end, Defendant is effectively trying to insert a comma in between the words "length" and "from" in the phrase (rendering the prepositional phrase "from said intermediate axial position to each of said first and second ends" nonrestrictive in nature).  Such a construction would cause the phrase to mean "an inward taper extending over at least a portion of [the weight block's] length[, specifically, the portion] from said intermediate axial position to each of said first and second ends," thus requiring tapers to extend all the way to the ends of the weight block.[15]

Meanwhile, in construing the phrase as *not* requiring that the taper extend all the way to the weight block's end, Plaintiff is effectively trying to construe the words "its length" as meaning "the part of the weight block extending" (rendering the prepositional phrase "from said

---

[15]        For example, during oral argument, Defendant's counsel argued that what the language in question says is that "one portion of the taper extends from the intermediate axial position [to] one end, [and] the other portion [of the taper] extends from that intermediate [axial position] to the other end. . . .  *The patent doesn't show or describe a taper that only goes partway*."  (Oral Argument Tr. at 7-8 [emphasis added].)

intermediate axial position to each of said first and second ends" restrictive in nature).  Such a construction would cause the phrase to mean "an inward taper extending over at least a portion of [the part of the weight block extending] from said intermediate axial position to each of said first and second ends," thus permitting tapers that did not extend all the way to the ends of the weight block.[16]

In any event, regardless of the nature of the grammatical dispute in question, the Court finds that neither party's construction of the clause in question would be in accordance with the meaning that the clause would have to a person of ordinary skill in the art in question.  Rather, the Court finds that, as it is currently worded, the clause would be unclear and ambiguous to a person of ordinary skill in the art in question.  Moreover, a review of the other intrinsic evidence does not resolve the ambiguity.

In particular, none of the nine drawings depicts an inward taper that extends along only a portion of the weight block's length (from the intermediate axial position toward opposite, terminal ends); rather, the drawings depict only inward tapers that extend along the entirety of the weight block's length (from the intermediate axial position to opposite, terminal ends).  However, it is improper to read a limitation into a claim simply because of what is shown in the patent's drawings.  *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) ("This court declines to import limitations to the claims from the specification absent a 'manifest' or 'explicit' exclusion.").  Rather, when construing claims, a court must consider *all* of the intrinsic evidence (including the patent's claims).  *See Pall Corp.*, 2007 WL 2363019, at *3.

---

[16]   For example, during oral argument, Plaintiff's counsel argued that what the language in question says is that "the taper only has to extend over at least a portion of [the weight block's] length."  (Oral Argument Tr. at 4.)

Moreover, while Defendants are correct that the prosecution history before the PTO indicates a change of the use of the words *"toward* each [of two terminal ends]" to the words "*to* each [of two terminal ends]" (*see generally* Dkt. No. 24, Parts 17-21 [emphasis added]), this change does not appear to be as material as Defendant believes it to be.[17]  As an initial matter, the Court notes that–in addition to using the words "toward each [of two terminal ends]" three times in its original patent application, Plaintiff used the words "to each [of terminal ends]" twice in that application.  (Dkt. No. 24, Part 18, at 7, 11-13, 15 [attaching pages "6," "10," "11," "12," and "14" of the application].)  In any event, a careful reading of the prosecution history yields little, if any, indication that the change in question was made specifically to overcome an objection made by the patent examiner.  The relevant objection of the patent examiner was merely as follows:

> Claims 1-17 are rejected under 35 U.S.C. § 102(a) as anticipated by or, in the alternative, under 35 U.S.C. § 103 as obvious over Fabanich (929).  The reference core 40 is a sphere which inherently has a maximum cross-section from which it tapers toward two opposite ends as broadly as claimed.  The burden is on the applicant to show that inherency is not involved.  <u>Ex parte gray 10 USPO 2d 1922</u>.  Any possible distinctions over the reference device involves only ornamental design variants of said core 40 or the use of conventional materials to make said ball and core and such would be obvious to a person having ordinary skill in this art.

(Dkt. No. 24, Attach. 19, at 5 [Ex. EW-18 to Wright Decl.] [emphasis in original].)  Based on this explanation, the patent examiner's objection appears to have stemmed from the fact that the Fabanich patent disclosed a spherically shaped core, which therefore, by necessity, also had tapers extending inwardly away from a maximum cross-section; whether the tapers extended

---

[17]     During oral argument, as in Defendant's motion papers, Defendant's counsel characterized this change as being responsive to the patent examiner's objections, "significant" and "very important."  (Oral Argument Tr. at 34; Dkt. No. 24, Attach. 26, at 15; Dkt. No. 24, Attach. 25, at ¶¶ 84-86.)

"toward" those two opposite ends or extended "to" those two opposite ends appears to have been of no consequence to the patent examiner.[18]  Clearly, Plaintiff did not expressly reference any understanding of such an objection in its written reapplication.  (Dkt. No. 24, Attach. 20 [Ex. EW-19 to Wright Decl.].)  Indeed, the Court cannot help but note that, in its reapplication's revised "Abstract of the Disclosure," and the final patent, Plaintiff continued to use the words "*towards* opposite, terminal ends."  (*Id.* at 2 [emphasis added]; *see also* Dkt. No. 24, Attach. 2, at 2 [Ex. EW-1 to Wright Decl.].)

As a result, extrinsic evidence is required to ascertain the meaning of the clause in question.  However, neither party has submitted extrinsic evidence that supports its interpretation of the clause.  While Defendant has adduced the declaration of an expert witness (Yoshitaka Aida), that declaration only conclusorily assumes that, without explaining why, the clause in question requires the taper to continue to the end of the weight block.  (Dkt. No. 24, Part 14, ¶ 4 [Ex. EW-13 to Wright Decl.].)  For these reasons, the Court concludes that a genuine issue of material fact exists regarding whether the weight block's inward taper must extend all the way to the block's terminal ends or only a portion of the way to those terminal ends.

With regard to the second issue raised by the parties' motion papers (i.e., whether the weight block's "intermediate axial position" must occur at only one point or line, or whether it may occur at any of several points or lines), the Court begins its analysis by noting that, in Plaintiff's response, Plaintiff chose to not oppose Defendant's argument on this issue.  (*See generally* Dkt. No. 25 [Plf.'s Opp. Memo. of Law].)[19]  In this District, a movant's burden with

---

[18]      The Court notes that absent from Defendant's motion papers is a copy of the Fabanich patent (U.S. Patent Reg. 4,913,429, issued on April 3, 1990).

[19]      During oral argument, Plaintiff's counsel appeared to concede that Plaintiff intentionally did not respond to this argument because it "implicitly accept[ed]" that argument. (Oral Argument Tr. at 19-20.)

regard to an unopposed motion is lightened such that, in order to succeed, the movant need only

show its entitlement to the relief requested in its motion, which has appropriately been

characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed

motion is unopposed and the Court determines that the moving party has met its burden to

demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279,

2009 WL 3672105, at *1 n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases).  Here,

the Court finds that Defendant has met that modest burden.  (In any event, even if the Court were

to subject this aspect of Defendant's motion to the level of scrutiny appropriate for a contested

motion, the Court would find that Defendant has met its burden on this aspect of its motion.)

The Court makes this finding for three reasons.  First, Plaintiff's patent repeatedly uses

the phrase "*an* intermediate axial *position*" [emphasis added], suggesting that this location

(which, again, is the maximum cross-section of the weight block) exists at one, and only one,

point (or line) of the weight block.  Second, none of the nine drawings depicts "an intermediate

axial position" (at which position occurs the maximum cross-section) that occurs at any number

of points (or lines); rather, the drawings depict "an intermediate axial position" that occurs at

only one point (or line).  Third, both the patent and the prosecution history before the PTO

suggest that one of the things that distinguishes Plaintiff's weight member from prior art weight

members (such as the weight members covered by the Pinel Patent) is the fact that Plaintiff's

weight member has an intermediate axial position that occurs at only one point or line (rather

than an intermediate axial position that occurs in any of several points or lines, as in the

maximum cross-section of a weight member containing a rectangular block in its middle),

resulting in less weight being devoted to the weight member's center.  (Dkt. No. 1, Part 2, at 5

[Ex. EW-1 to Wright Decl.]; Dkt. No. 24, Part 18, at 6, 8, 9 [Ex. EW-17 to Wright Decl.,

attaching pages "5," "7" and "8" of original patent application].)  For these reasons, the Court

concludes, based on the current record, that Plaintiff's patent covers weight blocks whose "intermediate axial position" occur at only one point or line (rather than occurring at any of several points or lines).

Finally, before the Court proceeds to a comparison of the properly construed claims regarding the taper and Defendant's bowling balls, the Court finds that a few words are appropriate regarding two issues obliquely referenced in the expert report of Defendant's expert, but not expressly raised in the parties' memoranda of law: (1) whether an infringing ball must have a *single* inward taper (or whether it may have *a multi-stage* inward taper); and (2) whether the inward taper must be a *straight* line (or whether it may be a *curved*).  (*Compare* Dkt. No. 24, Part 13, at 3, 10 [Ex. EW-12 to Wright Decl., attaching pages "2" and "9" of expert report] *with* Dkt. No. 24, Part 26 [Def.'s Memo. of Law] *and* Dkt. No. 25 [Plf.'s Opp. Memo. of Law].)[20]

The Court assumes the parties chose to not brief the first issue because it is unclear whether an infringing ball must have a single inward taper (or whether it may have a multi-stage inward taper).[21]  For example, on the one hand, Plaintiff's patent expressly requires that the inward taper be "uniform" (i.e., which a person of ordinary skill in the art in question might understand to mean "always the same," "unvarying" or "consistent").  Moreover, none of the nine drawings depicts a *multiple* inward taper (from the intermediate axial position toward opposite, terminal ends); rather, the drawings depict only a *single* inward taper (from the

---

[20]     The Court notes that the first such issue could be particularly significant because the original weight blocks in the World Class balls (as well as the new weight blocks in the World Class balls, and the weight blocks in the Satisfaxion balls) may have at least one "terminal end" consisting of a *second* inward taper.  (Dkt. No. 24, Part 23, at 5, 7, 9 [Exs. RM-1, RM-2, and RM-3 to Morris Decl.].)

[21]     The Court notes that, during oral argument, Plaintiff's counsel argued that Plaintiff's patent would cover balls with multiple tapers, while Defendant's counsel appeared to argue first that Plaintiff's patent would not cover balls with multiple tapers and then that it would cover such balls.  (Oral Argument Tr. at 5, 15-16, 20-22, 32, 36-39.)

intermediate axial position toward opposite, terminal ends).  Furthermore, Plaintiff's patent expressly requires that the weight member have "*an* inward . . . taper" extending from the intermediate axial position toward opposite, terminal ends.  (Dkt. No. 24, Attach. 2, at 7 [Ex. EW-1 to Wright Decl., attaching Plf.'s Patent] [emphasis added].)  Finally, Plaintiff's patent uses (1) the words "at least" to modify the length of the taper (rendering the absence of those words to modify the number of tapers conspicuous), and (2) the words "one or more" to modify the number of concentric layers (rendering the absence of those words to modify the number of tapers conspicuous).  On the other hand, Plaintiff's patent also uses the word "one" and "single" to describe the number of material types in conventional balls and the number of weight members in Plaintiff's patent (rendering the absence of that word to describe the number of tapers conspicuous).  Moreover, one might conceive of the phrase "have . . . an inward . . . taper" as meaning "have . . .  at least one inward . . . taper."

Similarly, the Court assumes the parties chose to not brief the second issue because it is unclear whether the inward taper must be a straight line (or whether it may be a curved).[22]  For example, on the one hand, as stated above, Plaintiff's patent expressly require that the inward taper be "uniform" (i.e., always the same, unvarying or consistent).  Moreover, none of the nine drawings depicts a *curved* inward taper; rather, the drawings depict only a *straight* inward taper. In addition, while the description of the drawings states that the surface may be "circular" rather than "planar," it describes such a circular surface as forming a "circular cone[]," indicating that the inward taper must still be straight.  Finally, the prosecution history before the PTO indicates that the "linearly tapered" shape of the weight block (as opposed to a "spherical" shape of a

---

[22]      The Court notes that, during oral argument, Plaintiff's counsel argued that Plaintiff's patent would cover balls with curved tapers, while Defendant's counsel appeared to argue that Plaintiff's patent would not cover balls with curved tapers.  (Oral Argument Tr. at 22-25, 39-41.)

weight block) is what distinguished this patent from the British patent.  (Dkt. No. 24, Part 20, at 7-9 [Ex. EW-19 to Wright Decl., attaching pages "6," "7," and "8" of amended patent application].)  On the other hand, one might conceive of the phrase "uniform" as describing, *inter alia*, the side of a symmetrical circle that turns consistently at an angle of 360 degrees.

However, again, the parties do not expressly address these issues in their memoranda of law.  As a result, the Court need not, and does not, decide them in this Decision and Order.

> **b.    Comparison of Properly Construed Claims Regarding Taper and Defendant's Bowling Balls**

Based on the above construction of the claims, the Court concludes that the record does not contain admissible evidence from which a rational factfinder could conclude that the weight block used in the Satisfaxion balls has a taper that begins to move inward from an "intermediate axial position" which occurs at only one point or line of the weight block.  This is because the sole record evidence adduced on the subject establishes that the weight block used in the Satisfaxion balls contains a rectangular "stabilizing mass" at its intermediate axial position or maximum cross-section.  (Dkt. No. 24, Part 23, at 5 [Ex. RM-1 to Morris Decl.].)

Similarly, the Court concludes that the record does not contain admissible record evidence from which a rational factfinder could conclude that the *new* weight block used in the World Class balls has a taper that begins to move inward from an "intermediate axial position" which occurs at only one point or line of the weight block.  This is because the sole record evidence adduced on the subject establishes that the *new* weight block used in the World Class balls contains a rectangular "stabilizing mass" at its intermediate axial position or maximum cross-section.  (*See*, *e.g.*, Dkt. No. 24, Part 23, at 9 [Ex. RM-3 to Morris Decl.].)

As a result, the Court grants Defendant's motion for summary judgment with regard to the Satisfaxion balls and the World Class balls containing the *new* weight block.

However, based on the above construction of the claims in dispute, the Court also concludes that the record contains admissible evidence from which a rational factfinder could conclude that the *original* weight block used in the World Class balls has a taper that begins to move inward from an "intermediate axial position" which occurs at only one point or line of the weight block.  As a result, the Court denies Defendant's motion with regard to the World Class balls containing the *original* weight block.

### c.   Meaning and Scope of Clause "Solid Body Having . . . [a] Homogeneous Density"

As stated above in Part I.B. of this Decision and Order, the third reason that Defendant argues that there has been no infringement of Plaintiff's patent is that the patent covers only balls that have a *solid* body with a weight block of a density that is the *same* as the density of the surrounding solid spherical body, and Defendant's balls have an "internal cavity" in which is located a weight block with a density that is *greater* than that of the surrounding solid spherical body.

As an initial matter, the Court notes that, to the extent that Defendant bases this argument on Plaintiff's failure to respond to Defendant's requests for admission regarding ball solidities and/or densities (specifically, Request for Admission Nos. 10-11, 13-14, 16-18, 20-45), the Court rejects that argument for the same reasons stated above, at the beginning of Part III.A.2.a. of this Decision and Order.

Proceeding to an analysis of the intrinsic evidence in this case, the Court begins by noting that what the patent actually requires is that the ball consist of, *inter alia*, "a solid body having a substantially spherical outer surface and a first homogeneous density."  (Dkt. No. 1, Part 2, at 7 [Ex. EW-1 to Wright Decl.].)  This is significant because it suggests that the words "first homogeneous density" relate merely to the ball's outer surface.  This interpretation is clearly

supported by the rest of the patent, which describes three different densities–each of which must be homogeneous internally but not the same as each other.

As indicated above, the "first homogeneous density" relates to the ball's "outer surface." The "second homogeneous density" relates to the ball's weight block. (*See id.* [using the term "second homogeneous density" to describe the density of the weight block, and later specifically requiring that the "weight member's density [shall be] homogeneous throughout"].)  The third homogeneous density–called the "predetermined homogeneous density"–relates to the "concentric layers" between the ball's outer surface and weight member. (*See id.* [describing "one or more concentric layers . . . each of said layers being of predetermined homogeneous density"].)

Plaintiff's patent describes the second homogeneous density as being different from the first homogeneous density. (*Id.* at 6 ["The weight block is constructed from a material having a density significantly higher than that of its surrounding cover."].)  Similarly, the patent requires the second homogeneous density to be different from both the first homogeneous density and the predetermined homogeneous density. (*Id.* at 7 [describing a "second homogeneous density [that is] substantially greater than [is] said first homogeneous density and said predetermined homogeneous density"].)  The Court notes that it is unclear (at least to the Court) how a patent regarding a weight block having the same density as the rest of a bowling ball would even be granted, given the apparent lack of effect of the weight block on the ball's angular momentum.

Finally, as for Defendant's related argument that Plaintiff's patent covers only balls with a *solid* body, the patent expressly requires the "weight member [to be] integrally positioned within and entirely surrounded by said [solid] body." (*Id.* at 7.)  In this way, the plain language of Plaintiff's patent recognizes that a ball may have a "solid body" even with a weight member "positioned" within that body.  Simply stated, to characterize the space that the weight member

occupies as a "cavity," and argue that such a cavity renders the ball not a "solid," as Defendant does, is unpersuasive to the Court: both Plaintiff's patent and Defendant's balls possess the same "cavity" and still retain the characteristic of being a "solid."

For these reasons, the Court concludes that, for purposes of Plaintiff's patent, balls that have a weight block positioned in them with a density that is *greater* than that of the ball's surrounding body are still balls with a "solid body."

> **d.     Comparison of Properly Construed Claims Regarding Density and Defendant's Bowling Balls**

Because Plaintiff's patent covers balls that have a weight block with a density that is greater than is the density of the surrounding body, the Court concludes that the fact that the Satisfaxion and World Class balls have a weight block with a density that is greater than the density of the body is not a ground upon which to base a dismissal of Plaintiff's infringement claim.  As a result, Defendant's motion is denied to the extent it is based on the density of its balls.

> **B.     Defendant's Counterclaim of Tortious Interference with Business Relations**

As stated above in Parts I.B. and I.C. of this Decision and Order, Defendant seeks summary judgment on this claim, and Plaintiff seeks the dismissal of this claim on the ground that it is barred as a matter of law.  More specifically, Defendant argues that "Plaintiff has admitted, *inter alia*, that the accusations and threats of litigation were made with the knowledge that the claims of the patent did not cover the accused balls and that they were made with malice and with the intent to damage Defendant."  (Dkt. No. 26, at 13.)  Based on Plaintiff's "admissions," Defendant argues that it has introduced evidence establishing that the accusations and threats were objectively baseless.  (*Id.*)  Plaintiff, on the other hand, argues that Defendant's counterclaim must be dismissed because no facts have been alleged plausibly suggesting, and/or

no admissible record evidence has been adduced establishing, that the accusations of infringement made by Plaintiff were objectively baseless.  (Dkt. 25, at 11.)

As an initial matter, the Court concludes that a majority of the 62 requests for admission related to Defendant's tortious interference counterclaim (i.e., Request for Admission Nos. 92-154) calls for the making of legal conclusions and/or the determination of ultimate issues, for the same reasons as stated above, at the beginning of Part III.A.2.a. of this Decision and Order.  For example, in Defendant's Request for Admission Number 86, Defendant asks Plaintiff to state whether, since filing its Complaint, it has contacted distributors of Defendant's balls and informed them that selling Defendant's balls could subject them to liability, and in Defendant's Request for Admission Numbers 104, 105, and 106, Defendant asks Plaintiff to state that, at the time it contacted these distributors, it knew that Defendant's balls did not infringe on Plaintiff's patent.  (Dkt. No. 24, Attach. 10, at 11, 13 [Ex. EW-9 to Wright Decl., attaching Request for Admission Nos. 86, 104, 105, 106].)

Moreover, the Court finds that it appears difficult for Defendant to establish that Plaintiff's infringement claims were objectively baseless in light of the following facts: (1) Plaintiff's infringement claim regarding the original weight member in the World Class balls has survived Defendant's motion summary judgment; and (2) it is well-settled that, "[e]ven if . . . one of [plaintiff's] m otives [in contacting defendant's customers] was to encourage [defendant's] customers to purchase [plaintiff's] products instead of [defendant's], 'a competitive commercial purpose is not of itself improper. . . .'"  *Plasmart, Inc.*, 442 F. Supp.2d at 57 (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 [Fed. Cir. 1998]).  However, the Court finds that, liberally construed, Defendant's Answer and Counterclaim has alleged facts plausibly suggesting that Plaintiff's infringement claim was objectively baseless.  Moreover, it appears that the parties have done little, if any, discovery on

this issue.

For all of these reasons, the Court denies both Defendant's motion for summary judgment, and Plaintiff's cross-motion for partial summary judgment, with regard to Defendant's counterclaim of tortious interference with business relations.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for partial summary judgment (Dkt. No. 24) is **GRANTED** **in part** and **DENIED** **in part** in the following respects: Defendant's motion is **GRANTED** on Plaintiff's infringement claim regarding the weight member in the Satisfaxion balls and the *new* weight member in the World Class balls, and Defendant's motion is **DENIED** on Plaintiff's infringement claim regarding the *original* weight member in the World Class balls, and Defendant's counterclaim of tortious interference with business relations; and it is further

**ORDERED** that Plaintiff's cross-motion for partial summary judgment (Dkt. No. 25) is **DENIED**; and it is further

Dated:  March 22, 2011
        Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge